STATE, Respondent, v. LARSON, et al, Appellants.

(264 N. W. 814.)

(File No. 7862.   Opinion filed February 5, 1936.)

*Charles Lacey*, of Sioux Falls, for Appellants.

*Walter Conway*, Atty. Gen., and *W. E. Weygent*, Asst. Atty. Gen., for the State.

RUDOLPH, J. ■ Defendants were convicted of robbery and have appealed. The principal assignment of error questions the sufficiency of the evidence to sustain the conviction. Singer, the prosecuting witness, testified that the three defendants induced him to go up into a hotel room with them and there robbed him of $350. The defense is that the prosecuting witness lost his money playing poker with these defendants. Accepting the testimony of the complainant at its face value, there is, without doubt, a conflict in the evidence which would make the finding of the jury conclusive. However, it is the position of the defendants that this testimony is utterly incredible and manifestly impossible and untrue. It requires an extraordinary case for any court to regard sworn testimony as untrue. Pooley v. Leith 62 S. D. 554, 255 N. W. 153. We must review the evidence with this rule in mind.

■ Singer testified that he was at his farm home west of Sioux Falls on December 18, 1934, at about noon when two of the defendants drove into his yard, told him they were horse buyers, and induced him to go to Sioux Falls to meet one Lane, who was the "head horse buyer." Singer testified that upon arriving in Sioux Falls these two men parked their car within the vicinity of the Lincoln Hotel; that they stated to him that they did not see Lane's car, and that he (Singer) might as well go ahead and transact whatever business he had and then return; that he then went to the Citizens National Bank, and there borrowed $350 and received this amount in currency, which sum he was going to use for purchasing corn from his landlord, paying some cash rent and using the balance to buy clothes for his children. After obtaining the $350, Singer testified he walked west on Ninth street toward the Lincoln Hotel corner where he met the two men who visited him at the farm, and was told by them that Lane was in the hotel. According to Singer's testimony, the three men then went into the hotel, and, not finding Lane in the lobby went up the stairs, "* * * and when we got in the hallway a little ways one fellow grabbed me and the other one both at the same time and they marched me over in the room. Ed Larson told me to keep my gab shut. When we got in there they shut the door and put me up against the door

there and they went through my pockets. Well after they had the money why I told them, I says, 'I didn't get that money for you fellows to steal from me. I got that to pay for some corn the landlord's share,' so I guess I said it kind of loud maybe too, the biggest Larson told me to keep my mouth shut if I knew what was good for me. Of course I kind of quieted down a little then and he says, 'You give us a couple of checks and we will give you your money back,' he says, so he asked me if I had any check blanks. I told him where I done my business and then this little Larson made out a couple of blanks, I don't know what bank they were on but I guess I put on the Citizen's National Bank. Really I didn't pay much attention to the checks. I knew I could have them stopped anyway, or they wouldn't be no good, so when he had the checks made out, he went out the door. He left them lay there on the dresser or comode or whatever that was. I went and signed them and this biggest Larson, he picked them up, looked at them awhile, then he tore them up, and just about that time why I went out the door."

Singer notified the police that he had been robbed and the police went immediately to the hotel room in question, and in the wastebasket found two checks signed by Singer which had been torn up, one in the amount of $320, and the other in the amount of $42. They also found two envelopes, on one of which was admittedly the signature of Alex Singer, and on the other the word "deck" had been written. On both envelopes marks had been placed with a pencil across the gummed flap on the envelope and the envelope proper, after it had been sealed. These two envelopes were alike except for the writing and the marking thereon. Singer testified that the envelope bearing his signature was one which contained the weights of his corn, and that it was taken from him at the same time that his money was taken from him. He proceeded in his rebuttal testimony to have his daughter testify that the envelope bearing his signature was one of a package of envelopes in the Singer home. A sample envelope from this package was offered in evidence. However, the offer of this sample envelope was withdrawn and the envelope was never received in evidence. The record quite satisfactorily shows that the reason why this offer was withdrawn was because it was discovered at the trial that the

sample envelope from the package in the Singer home did not correspond with the envelope, bearing Singer's signature, found in the wastebasket.

The cashier of the bank where Singer borrowed the money was produced as a witness for the state, and testified: "After Singer signed the note I asked him if he wanted the money or if he wanted it put on his checking account . He said, 'No, I have just got two fellows to pay, one gets $200.00 and one $150.00, and I will take currency.'"

At the preliminary hearing in this case Singer testified he borrowed the money for the purpose of buying the landlord's share of corn. It developed on the trial that the landlord's share of corn, according to Singer's testimony, amounted to about 300 bushels, and that the market price was about 84 cents. At the trial Singer testified that he also wanted to pay some cash rent. On cross-examination it appeared that his cash rent was not due until March and the money was borrowed on December 18th. It further appears from the testimony of Singer that he had no engagement with his landlord to buy this corn, had not agreed with the landlord definitely upon any price, and that on December 18, 1934, and at the time of the trial of the case, had his share of the corn on the farm. The landlord who was called as a witness on behalf of the state said that he judged his share of the corn was about 250 bushels by weight. In reply to the question, "Did you have any conversation with Alex Singer as to when the corn or buying the corn would take place?" answered, "I would say any time before the first of March. We generally like to have it cleaned up before the first of March."

It seems to us that the story advanced by Singer regarding the purpose for which he borrowed this money, viewed in the light of other testimony in the case, is too extraordinary and improbable to admit of belief. One feature of this story was that he was borrowing this money and paying interest thereon, for the purpose of paying cash rent which was not due until March, more than two months after the time the money was borrowed. The part of the story regarding borrowing this money to purchase the landlord's share of corn is so evasive and filled with so many inconsistencies as to render it unworthy of belief. According to Singer's own

testimony, he had no definite understanding with his landlord regarding the purchase of this corn. The agreement was that Singer could purchase at any time before the 1st of March. Singer's idea of the landlord's share of the corn and the landlord's idea varied at least to the extent of 50 bushels. The price had not been definitely agreed upon. Just why Singer would want to borrow money, and in addition have it in currency rather than placed to his credit in his checking account, before any agreement to buy the corn had assumed some definite form, and when Singer at the time had all of his share of corn on the farm, is reasonably subject to no such explanation as here attempted.

Singer's story that these men grabbed him in the hallway, a more or less public place, at a time when he was peacefully going to their room, which was private, seems to us to be at least unrealistic. And that part of Singer's story where he said that, after these men had robbed him, they offered to give his money back if he would give them two checks, to our minds would tax the credulity of the most unsophisticated. Singer further testified that, after these men had robbed him, they permitted him to go out the door, made no attempt to detain him, and at least one of the three men stayed in the room thereafter. Surely it is at least an unusual performance for men to commit a robbery in a hotel room and then let a victim blithely walk out the door. Singer's testimony regarding the envelope bearing his signature which was found in the wastebasket is rendered unworthy of belief when considered in the light of the subsequent attempt to make out that this envelope had come from a package of envelopes in the Singer home, and the failure of that attempt.

It is apparent from what has been said above that it is our opinion that this is one of those extraordinary cases wherein this court must regard sworn testimony as manifestly impossible and untrue. It should be pointed out that the finding of the torn checks, the finding of the envelopes, one of which admittedly bore the signature of Singer, and Singer's getting $350 in currency, corroborated the story told by defendants. In this connection we should also mention the fact that Singer accuses these defendants by the information which he signed and by his testimony of robbing him of $350. Yet the checks which he says he gave these

robbers for the purpose of getting his $350 in currency returned totaled the sum of $362. No explanation of any kind is given, neither is it explained why two checks were given.

We think it unnecessary to further detail our reasons for believing the story of Singer incredible. The facts above recited speak stronger for themselves than could any further written discussion. We believe this to be a case where the jury and, perhaps the trial judge were moved to convict and sustain the conviction because of the disreputable character of the defendants as disclosed by the record. After a careful consideration of the record, we can come to no conclusion other than that above announced. The record, in our opinion, will not sustain a conviction of the crime charged in the information.

The judgment and order appealed from are reversed.

All the Judges concur.